UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WENDY KAY COHOON,

      Plaintiff

                                  Civil Action No.  18-10866

v.                              HON.  LAURIE J. MICHELSON
                                  U.S. District Judge
                                  HON. R. STEVEN WHALEN

COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Wendy Kay Cohoon ("Plaintiff") brings this action under 42 U.S.C. § 405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Plaintiff's Motion for Summary Judgment [Docket #14] be GRANTED to the extent that the case be remanded to the administrative level for further proceedings, and that Defendant's Motion for Summary Judgment [Docket #21] be DENIED.

## PROCEDURAL HISTORY

On June 14, 2012,  Plaintiff filed an application for DIB, alleging disability as of February 4, 2011 (Tr. 367).  After the initial denial of the claim, Plaintiff filed a  request for an administrative hearing, held on January 24, 2014 (Tr. 121-139).  Following a February 7,

2014 unfavorable determination by the Administrative Law Judge ("ALJ") then assigned to Plaintiff's claim, on June 17, 2015, the Appeals Council remanded the case for rehearing (Tr. 173-176).   Following a second hearing on September 28, 2015, on November 17, 2015, the ALJ again found that Plaintiff was not disabled (Tr. 84-120, 205).   On September 13, 2016, the Appeals Council again remanded the case for rehearing, this time assigning the case to a different ALJ (Tr. 204-206).

On March 22, 2017 in Flint, Michigan, ALJ Kevin W. Fallis conducted a third administrative hearing (Tr. 37).   Plaintiff, represented by attorney Rita Shoka, testified (Tr. 46-69), as did Vocational Expert ("VE") Jacquelyn D. Schabacker (Tr. 20, 69-80).   On August 1, 2017, ALJ Fallis found Plaintiff was not disabled on or before the date last insured for DIB benefits of December 31, 2016 (Tr. 11-27).   On January 12, 2018, the Appeals Council denied review (Tr. 1-3).   Plaintiff filed for judicial review of the final decision in this Court on March 15, 2018.

### BACKGROUND FACTS

Plaintiff, born October 24, 1964, was 52 on the date last insured for DIB of December 31, 2016 (Tr. 27, 367).   She obtained a GED and worked previously as a mail carrier (Tr. 410).   She alleges disability due to neck and shoulder injuries sustained in a car accident (Tr. 409).

#### A.  Plaintiff's Testimony (March 22, 2017 Hearing)

Plaintiff offered the following testimony:

She lived in Swartz Creek, Michigan with her husband and brother (Tr. 47).   Her husband worked but her brother was disabled as a result of bipolar disorder (Tr. 47-48).   She did not participate in her brother's care (Tr. 48).   Plaintiff was right-handed and weighed 194 pounds (Tr. 49).   Her exercise was limited to some physical therapy-type shoulder exercises

-2-

(Tr. 50). She drove on an as-needed basis but did not drive more than once a month (Tr. 50). She was unable to drive for more than 15 minutes before requiring a position change (Tr. 51).

Plaintiff had not worked since February, 2011 (Tr. 51). She sustained injuries in a car accident in June, 2010 (Tr. 51). Between June, 2010 and February, 2011, she became increasingly challenged by the physical demands of her job (Tr. 51-52). Plaintiff experienced the medication side effects of lightheadedness and slight nausea (Tr. 53). Since the last hearing, she had experienced significant muscle loss in the upper extremities (Tr. 54). For the entire period under consideration, she experienced pain in the lower part of her skull, neck, ears, shoulders, hips, knees, both sides of the spine, and middle and lower back (Tr. 54). She was limited to lifting under 10 pounds on an isolated basis (Tr. 55). She was unable to sit for more than 15 minutes or walk for more than 100 feet (Tr. 55). She was unable to stand without leaning on something for support (Tr. 55). She experienced occasional numbness of the ring and pinky fingers (Tr. 56). She relied on her husband to perform all of the household chores but was generally able to care for her own personal needs (Tr. 56).

Plaintiff and her husband had gone camping for two days the previous summer, sleeping in a trailer (Tr. 57). They had been scheduled for a seven-day trip but Plaintiff stayed only two nights due to discomfort (Tr. 57). In contrast, Plaintiff and her husband vacationed "constantly" prior to the 2010 car accident (Tr. 58). Since then, Plaintiff spent her time watching television and playing games on her cell phone (Tr. 58). While watching television, she frequently had to rerun the movie or program to understand the plot or dialogue (Tr. 58). She also had "trouble with words" to the extent that she would forget what she was going to say in mid-speech (Tr. 58). She attributed the concentrational problems to medication side effects but noted that her ability to focus had deteriorated in the year before the hearing (Tr. 59). She and husband dined out on rare occasions (Tr. 60). She slept six

hours a night and since starting a new medicine was able to sleep without interruption (Tr. 61). She tried to avoid daytime naps but sometimes fell asleep in a recliner (Tr. 62). When taking muscle relaxers she slept on and off "all day" (Tr. 61). She smoked up to 12 cigarettes a day but consumed alcohol rarely (Tr. 62). She attributed a September, 2016 positive urine test for marijuana to second-hand smoke resulting from her brother's therapeutic use of marijuana (Tr. 63). She noted that she stopped treatment with her former treating neurologist Dr. Jennings the same month because she found a closer health care provider (Tr. 63). On a scale of one to ten, the pain medication reduced her pain from "ten" to "four" (Tr. 64).

Plaintiff experienced agonizing headaches at least once a week lasting from one to four days (Tr. 64). She coped with the headaches with pain medication, ice packs, and reclining (Tr. 65). She also experienced constant, unreasonable worry that something would happen to her grandchildren (Tr. 66). The condition of diabetes was not controlled (Tr. 66). She also experienced heart palpitations (Tr. 66). Due to hand numbness, Plaintiff sometimes dropped items (Tr. 67). For ease of dressing, she wore mostly "baggy" clothes and pull-overs (Tr. 67). She experienced more pain in the right shoulder than in the left (Tr. 67). She experienced difficulty reaching forward and was unable to reach overhead with the right arm (Tr. 68). She experienced difficulty climbing stairs due to hip and knee problems (Tr. 68).

Plaintiff finished her testimony by noting that after the June, 2010 accident, she opted to go back to work, despite extreme pain, before giving up in February, 2011 (Tr. 69).

-4-

**B.     Medical Evidence[1]**

**1.  Records Related to Plaintiff's Treatment**

In June, 2010, Plaintiff sought emergency room treatment for left shoulder and rib pain following a car accident (Tr. 701).   In June, 2010, John Stoker, D.O. found that Plaintiff was unable to work between June 18 to June 26, 2010 (Tr. 898).  In August, 2010, Dr. Stoker noted that an  MRI of the cervical spine showed multilevel disc herniation (Tr. 526-527, 532, 602, 913).  He  prescribed physical therapy (Tr. 801).  October, 2010 EMG testing of the upper extremities was normal (Tr. 528, 747).  December, 2010 records by Mazher Hussain, M.D. note symptoms of cervical degenerative disc disease and facet arthropathy (Tr. 537-538).  Physical therapy notes from the same month note a stiff neck and antalgic gait (Tr. 536).  Plaintiff reported up to level "ten" pain but denied radiating pain in the upper extremities (Tr. 537).  The following month, Plaintiff commenced a series of nerve blocks (Tr. 749-754).

January, 2011 records by neurologist Henry Hagenstein, D.O. note Plaintiff's report of continual pain (Tr. 542, 740).   February, 2011 physical therapy records note level "eight" pain with activity (Tr. 546, 758).  Dr. Stoker found that Plaintiff was unable to work between February 4, 2011 and May 31, 2011 due to left shoulder tendinitis and cervical myositis (Tr. 812, 828).  April, 2011 physical therapy records note pain and tenderness of the left shoulder, stiff neck, antalgic gait, and reports of level "seven" pain with activity (Tr. 548).  Dr. Stoker's records from the same month note continued neck pain, muscle spasms, and

---

[1]

Records predating and post-dating the relevant period (February 4, 2011 through December 31, 2016) are included for background purposes only.  Because Plaintiff does not dispute the findings regarding her psychological limitations, the mental health records, while reviewed, are omitted from the present discussion.

radiating pain in the upper extremities (Tr. 803). Plaintiff denied paralysis and exhibited a normal range of motion (Tr. 803-804). A July, 2011 CT of the left shoulder showed irregularity of the anterior cortex of the humeral head, cystic changes, sclerosis, and "loose bodies" of the joint (Tr. 551-552, 606, 912). An MRI of the shoulder from the same month showed a tear of the anterior supraspinatus tendon (Tr. 550, 610). The same month, A. George Dass, M.D. recommended non-surgical treatment for the left shoulder condition (Tr. 900). He observed full strength and a normal gait (Tr. 901).

In September, 2011, Nadine S. Jennings, M.D. noted Plaintiff's report of "almost [] immediate onset" of severe neck pain following the June, 2010 car accident (Tr. 555). Dr. Jennings noted full strength in the upper extremities but a limited range of neck motion and signs of cervical disc herniation and adhesive capsulitis of both shoulders (Tr. 556, 596, 600). Plaintiff reported "satisfactory pain control" with Naproxen, Neurontin, Flexeril, and Percocet (Tr. 557). A September, 2011 MRI of the lumbar spine showed a herniated disc with cord deformity at C5-C6 (Tr. 558, 597). Dr. Stoker's October, 2011 records show a normal gait and station but a decreased range of motion of the left upper extremity (Tr. 511). Dr. Stoker's November, 2011 records note that Plaintiff reported "constant aching neck pain," right hand numbness, and no improvement in her pain level with Percocet (Tr. 560). Imaging studies of the spine from the same month show moderate spondylosis at C5, C6, and C7 (Tr. 595). After undergoing a series of epidural injections, an anterior cervical discectomy was recommended (Tr. 593, 1184, 1186). On December 7, 2011, a complete radical anterior cervical discectomy was performed at C5-C6 (Tr. 579, 936-937).

A January, 2012 MRI of the cervical spine showed post fusion mild cord effacement at C4-C5 and mild cord effacement with mild to moderate stenosis at C5-C6 (Tr. 561, 570-571, 1239-1240). The following month, Plaintiff reported continued, significant neck and

shoulder pain with spasms of the cervical and thoracic spine (Tr. 567, 1150). The same month, Dr. Jennings noted radiculopathy of the upper extremities and shoulder (Tr. 564). She diagnosed Plaintiff with cervical post-laminectomy syndrome and adhesive capsulitis of both shoulders (Tr. 564). She re-prescribed Neurontin (Tr. 564). The same month, Dr. Stoker noted a decreased range of left shoulder motion and muscle spasms of the spine (Tr. 1236). Physical therapy records from the following month note stooped posture with an antalgic gait (Tr. 1192).

Dr. Jennings' records include April, 2012 EEG studies showing no evidence of cervical radiculopathy but "very mild" right median neuropathy of the wrist consistent with Carpal Tunnel Syndrome ("CTS") (Tr. 1277). In May, 2012, Dr. Jennings noted that Plaintiff was independent in self care activities and had increased "household activity level" without discomfort (Tr. 1270). Plaintiff demonstrated full muscle strength in all groups (Tr. 1268). The same month, Dr. Stoker found that Plaintiff was unable to return to her former job due to the shoulder and cervical spine conditions resulting from the June, 2010 accident (Tr. 1210). His treatment records from the same month note tenderness and a decreased range of cervical spine motion (Tr. 1218). The following month, he found that Plaintiff was incapacitated from June 25, 2012 to September 1, 2012 (Tr. 1215).

A June, 2012 nerve block was administered without complications (Tr. 1262). Plaintiff reported decreased pain two days after the injection (Tr. 1253, 1261). Dr. Jennings' records from the end of the same month note that Plaintiff was "careful and slow" but independent in activities of daily living (Tr. 1250). Dr. Jennings' records from the following month note that Plaintiff's improvement had started to "plateau" and that she was restricted in daily activities (Tr. 1244). The same month, Dr. Stoker noted fair prognosis (Tr. 1281). Dr. Jennings' September, 2012 records note Plaintiff's report of level "ten" pain without

medication and "three" with (Tr. 1286).  Plaintiff reported pain with sitting, standing, walking, social activity, lifting, and in personal care activity (Tr. 1286).  She denied improvement from injections (Tr. 1286).  An October, 2012 examination by Dr. Stoker showed 5/5 motor strength and a normal station and gait (Tr. 514).  Plaintiff demonstrated a normal range of upper extremity motion (Tr. 514).  Dr. Stoker noted that Plaintiff had made no recent progress and still had only a "fair" prognosis (Tr. 1408).  An April, 2013 MRI of the cervical spine showed a herniated disc at C5-C6 with mild cord effacement (Tr. 1389).  November, 2013 records by Dr. Stoker note Plaintiff's report of continuing neck pain (Tr. 1472).

April, 2015 records note a normal gait with a moderately reduced range of cervical spine and left shoulder motion with muscle spasms and mild pain (Tr. 1421).  The same month, Plaintiff reported continued muscle weakness and neck pain (Tr. 1513).  An MRI of the cervical spine from the same month showed a small disc protrusion at C3-C4 with mild cord effacement (Tr. 1455, 1647).

In July, 2015, Dr. Jennings completed a Physical Residual Functional Capacity Questionnaire, noting a diagnosis of cervical post-laminectomy syndrome (Tr. 1519, 1661).  She noted the symptoms of neck pain and headaches (Tr. 1519). She found that pain would interrupt Plaintiff's work frequently but that Plaintiff was capable of low stress jobs (Tr. 1520).  She found that Plaintiff was unable to sit for more than 30 minutes at a time or stand for more than 15 (Tr. 1520).  She found that Plaintiff was limiting to sitting four hours a day and standing/walking for two (Tr. 1520).  She found the need for a sit/stand option (Tr. 1521).  She found that Plaintiff was limited to lifting less than 10 pounds, and turning her head on an occasional basis (Tr. 1521).  She precluded all use of ladders and limited Plaintiff to "rare" twisting, stooping, crouching, and occasional climbing of stairs (Tr. 1522).  She

found that Plaintiff was limited to performing fine manipulative tasks for 50 percent of the workday and reaching for 10 percent of the workday (Tr. 1522).  The following month, Plaintiff reported severe bilateral knee pain (Tr. 1620).  Imaging studies showed early degenerative changes of the knees (Tr. 1646).  In November, 2015, she reported level "four" pain (Tr. 1607).

May, 2016 EEG testing of the upper extremities was unremarkable (Tr. 1641).  In June, 2016, Plaintiff reported ongoing neck pain (Tr. 1450).  The following month, she reported level "five" pain with "poor" results from pain medication (Tr. 1554).  September, 2016 records by Dr. Jennings note the ongoing conditions of cervical post-laminectomy syndrome, cervical radiculopathy, headaches, neck pain, muscle weakness, and reflex abnormalities (Tr. 1706-1709).  Drug screening from the same month was positive for marijuana use (Tr. 1716).  November, 2016 records by Kristin Nikolakeas, D.O. note a normal gait and station (Tr. 1730).  In December, 2016, Dr. Nikolakeas noted that Plaintiff required ongoing nerve blocks for treatment of chronic headaches (Tr. 1740).  Plaintiff exhibited a limited range of cervical spine motion but a normal gait (Tr. 1724).  January, 2017 by Dr. Nikolakeas note no restriction in motion (Tr. 1734).  February, 2017 records by Dr. Nikolakeas note upper extremity tingling, headaches, and arm weakness (Tr. 1720).

### 2.  Non-Treating Records

In November, 2011, neurologist W.J. Boike, M.D. performed an independent medical evaluation ("IME"), noting Plaintiff's report of left-sided neck pain with radiation into the left scapula (Tr. 1786).  Plaintiff reported intermittent numbness of the right third and fourth fingers but no pain or paresthesias of the left arm (Tr. 1786).  Plaintiff exhibited normal extremity strength but a reduced range of cervical spine motion and difficulty raising either arm overhead (Tr. 1788).  Dr. Boike opined that Plaintiff would be able to perform her usual

work, noting that she was able to perform the work "for many months after the motor vehicle accident" (Tr. 1789). However, in May, 2012, Dr Boike amended the original IME, noting that the records created after the December, 2011 laminectomy showed continuing "significant neck discomfort" and that a post-surgery MRI showed mild to moderate stenosis (Tr. 1790). He found that Plaintiff was currently unable to return to her former job (Tr. 1792).

In November, 2012 occupational therapist Todd Hagberg performed a one-time evaluation at the request of Dr. Jennings, finding that Plaintiff was capable of sedentary work with the ability to lift up to 20 pounds from the floor to shoulder and 10 pounds overhead (Tr. 1290). He found that Plaintiff could stand for up to 65 minutes at a time, walk for 20, and sit for 45 (Tr. 1292). She exhibited normal grip and pinch strength but poor coordination testing (Tr. 1293, 1296).

In December, 2012, Clifford M. Buchman, D.O., performed a consultative examination of Plaintiff on behalf of the SSA, noting her report of continued pain following the December, 2011 surgery (Tr. 624). Plaintiff denied current numbness (Tr. 624). She reported that she was unable to perform household tasks, reach overhead, or lift a gallon of milk (Tr. 624). She noted that she needed assistance in showering and dressing (Tr. 625). Dr. Buchman observed a normal gait and normal fine manipulation abilities (Tr. 626). He noted the diagnosis of tendinitis of the left shoulder with adhesive capsulitis (Tr. 626). He found that Plaintiff could sit, stand, or walk for eight hours but was limited to lifting "floor to waist" 15 pounds and "waist to chest," seven pounds (Tr. 626). He precluded all overhead work but found no limitation in fine manipulation (Tr. 626-627).

In January, 2013, R. H. Digby, M.D. performed a non-examining assessment on behalf of the SSA, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit,

stand, or walk for about six hours in an eight-hour workday; and perform unlimited pushing/pulling in the lower extremities (Tr. 147). He found that Plaintiff's ability to push/pull in the upper extremities was compromised by post-laminectomy syndrome and left shoulder tendinitis (Tr. 148). He limited Plaintiff to occasional postural activity with a limited ability to reach overhead bilaterally (Tr. 148). He found that she should avoid even moderate exposure to hazards such as machinery and heights (Tr. 149).

A September, 2013 vocational rehabilitation evaluation by Robert B. Ancel, Ph.D. states that Plaintiff was "totally unable to return to her previous work . . ." (Tr. 1407). Dr. Ancel found that she was "totally unemployable" (Tr. 1407).

In October, 2016, Molly Rossknecht, D.O. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report of severe shoulder and neck pain since June, 2010 (Tr. 1693). Dr. Rossknecht noted a limited range of cervical and lumbar spine motion and a limited range of shoulder motion (Tr. 1694). Plaintiff demonstrated a normal grip with good dexterity (Tr. 1694).

Dr. Rossknecht noted mild difficulty squatting (Tr. 1694). She noted "mild difficulty secondary to pain" but a normal gait and grip strength (Tr. 1696). She checked boxes noting that Plaintiff could lift up to 50 pounds occasionally and up to 10 frequently but hand-wrote that Plaintiff was limited to lifting no more than 20 pounds (Tr. 1697-1698). She found that Plaintiff could sit or stand for up to 30 minutes at a time and walk for 15 (Tr. 1697). She found that over the course of the workday, Plaintiff could sit for four hours, stand for two and walk for two (Tr. 1697). She found that Plaintiff could perform fine manipulations continuously (Tr. 1699). She found that Plaintiff could frequently climb stairs, balance, and stoop but was otherwise limited to occasional postural activity (Tr. 1700). She found that Plaintiff could be exposed to various environmental conditions frequently with the ability to

-11-

be "continuously" exposed to airborne hazards (Tr. 1701).

In November, 2016, Nathan Gross, M.D. performed an IME, noting level "four" pain with activity (Tr. 1778). Dr. Gross noted that EMG studies had been negative (Tr. 1778). Plaintiff reported that injections had not been helpful (Tr. 1778). She denied gait disturbances or arm weaknesses (Tr. 1779). Plaintiff exhibited a limited range of neck and shoulder motion without radiculopathy (Tr. 1779). She exhibited normal upper extremity reflexes (Tr. 1780). Dr. Gross concluded that Plaintiff could "care for herself" and was capable of working in a position not involving extensive jarring or twisting of the neck or lifting more than 20 to 25 pounds (Tr. 1783).

### C.    Vocational Expert Testimony (March 22, 2017 Hearing)

VE Schabacker classified Plaintiff's past relevant work as a rural mail carrier as unskilled and exertionally medium (exertionally heavy as performed)[2] (Tr. 72, 497). The VE stated that her testimony would be consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") and her "knowledge, education, training, and experience" (Tr. 70). The ALJ then described a hypothetical individual of Plaintiff's age, educational level, and work experience:

> [T]his individual would be limited to light work. They would be able to stand or walk for a total of two hours walking, two hours standing, four hours sitting. They would be able to walk for 20 minutes and [] stand for 45 minutes. This individual could perform occasional pushing and pulling. They could never climb ladders, ropes, or scaffolds. They can occasionally climb ramps or

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

stairs, occasionally balance, stoop, knee, crouch, and crawl. This individual could never perform overhead reaching. They would have to avoid even moderate use of hazardous moving machinery. They would have to avoid all exposure to unprotected heights. Additionally, this work would be limited to simple, routine, repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions and routine workplace changes. Could this individual do Ms. Cohoon's past work? (Tr. 72-73).

The VE testified that the above-limited hypothetical individual could not perform Plaintiff's past relevant work, but could perform a "restricted" range of unskilled light work allowing for the jobs of cashier (350,000 in the national economy ); inspector/hand packager (80,000); and bench assembler (125,000) (Tr. 76).

The VE testified that if the individual were additionally limited to occasional reaching, no exertionally light work would be available (Tr. 76). The VE testified that if the original hypothetical question were amended to restrict the individual to sedentary work, the individual could perform the sedentary unskilled work of an order clerk (12,000); final assembler (50,000); and inspector (42,000) (Tr. 77). The VE testified that if the original hypothetical question were amended with a restriction to sedentary work *and* a limitation to occasional reaching, the only position available would be surveillance system monitor (15,000) (Tr. 77). The VE testified that the need to be off task for 20 percent of the work day, or the need to miss two days of work each month due to "doctor visits, symptoms" or medication side effects would preclude all work (Tr. 77-78).

In response to questioning by Plaintiff's counsel, the VE testified that if the original hypothetical question were amended with a restriction to occasional handling and fingering, all of the light jobs would be eliminated (Tr. 79). She testified that the occasional handling and fingering restriction would also eliminate all sedentary work except for the surveillance monitor position (Tr. 80).

### D.  The ALJ's Decision (August 1, 2017)

ALJ Fallis found that Plaintiff had not engaged in substantial gainful activity for the period under consideration of February 4, 2011 through the date last insured of December 31, 2016 (Tr. 13).

Citing the medical records from that period, the ALJ found that Plaintiff experienced the severe impairments of "status/post cervical spine surgery with residual pain, weakness, and reduced range of motion, degenerative joint disease of the shoulders (bilaterally), degenerative disc disease, [CTS], chronic liver disease, mood disorder and cannabis use disorder," but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 14).  He found that the condition of diabetes mellitus was non-severe (Tr. 14).  He found that Plaintiff experienced moderate limitation in "understanding, remembering, or applying information" and in "concentrating, persisting, or maintaining pace" but only mild limitation in "interacting with others" and in "adapting or managing oneself" (Tr. 15).

ALJ Fallis found that Plaintiff retained the residual functional capacity ("RFC") for light work with the following restrictions:

> [C]laimant is limited to lifting and carrying up to 20 pounds and up to 10 pounds frequently, sitting up to four hours, standing and walking up to a total of two hours each, stand no longer than 45 minutes at one time, and walk no longer than 20 minutes at one time, during an eight-hour workday.  The claimant is limited to occasional pushing/pulling and occasional climbing ramps/stairs, balancing, stooping, kneeling, crouching and crawling, but no climbing using ropes, ladders and scaffolds.  Furthermore, the claimant is limited to no overhead reaching.  The Claimant should avoid even moderate exposure to moving (hazardous) machinery and all exposure to unprotected heights.  In addition, the claimant is limited to simple, routine and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work related decisions and routine work place changes (Tr. 16).

Citing the VE's testimony, the ALJ found that although Plaintiff was unable to perform her

former work, she could work as cashier, inspector/hand packer, and bench assembler (Tr. 27, 76).

The ALJ provided an extensive discussion of the opinion evidence (Tr. 19-25).  He cited Dr. Buchman's December, 2012 consultative finding that Plaintiff could walk eight hours a day but was limited to 15 pounds lifting (Tr. 19).   He noted that in October, 2016, Dr. Rossknecht found that Plaintiff could lift up to 20 pounds and did not experience fine manipulative limitation (Tr. 20).  He assigned partial weight to the opinions by Dr. Buchman and Dr. Rossnecht to the extent that they supported the RFC for light work (Tr. 24).  He noted that in October, 2016, Plaintiff was capable of lifting up to 20 pounds occasionally (Tr. 20).  He noted that in 2016, Dr. Nikolakeas found normal strength (Tr. 20).  The ALJ rejected Stoker's October, 2013 opinion that Plaintiff was disabled, noting that the ultimate issue of disability was reserved for the Commissioner (Tr. 22).  He accorded "partial weight" to Dr. Gross' November, 2011 finding that Plaintiff could perform work activity (Tr. 22-23).  He assigned "great weight" to Dr. Boike's June, 2012 opinion (addendum to the original November, 2011 opinion) that she was not capable of her former work (Tr. 23).

The ALJ accorded "little weight" to Dr. Jennings' July, 2015 opinion that Plaintiff was limited to lifting less than 10 pounds occasionally and was capable of bilateral fingering for only 50 percent of the workday, finding that her opinion was "inconsistent with the treatment notes" and contained "significant limitations that are not supported by the clinical findings of record" (Tr. 23).

The ALJ accorded "significant weight" to Occupational Therapist Hagberg's observation that Plaintiff "demonstrated overall abilities within the sedentary category of work (Tr. 24). The ALJ cited Hagberg's finding that Plaintiff could lift up to 20 pounds (Tr. 24).  He noted that Hagberg found that she "needed to be limited to sustained or repeated

cervical flexion with work positioned within optimal visual fields" (Tr. 24).  He accorded "little weight" to Dr. Ancell's finding that Plaintiff was unable to perform any work (Tr. 24). Finally, the ALJ assigned "great weight" to Dr. Digby's January, 2013 finding that Plaintiff could perform light work activity (Tr. 25).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less than a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).  The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A. Light Work

In her first argument, Plaintiff contends that the finding that she could perform exertionally light work is not supported by either the medical evidence or Defendant's own definition of "light work." *Plaintiff's Brief,* 14-17, *Docket #14,* Pg ID 1862. She notes that the question of whether she is actually capable of light work is particularly critical, given that under the Social Security regulations, a finding that she was instead limited to sedentary work would direct a finding of disability as of her 50th birthday of October 24, 2014. *Id.*; 20 C.F.R. Part 404, Subpart P, Appendix 2).

Light work, as defined by the regulations, involves the following

[L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full

or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

"[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6 (January 1, 1983). "Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing - the primary difference between sedentary and most light jobs."

The "light" RFC crafted by the ALJ allows for lifting of up to 20 pounds occasionally and 10 frequently consistent with a full range of light work (Tr. 16). However, the RFC's standing and walking limitation to two hours each in an eight-hour workday straddles the six-hour stand/walk requirement for light work and the two hours of walking or standing required for sedentary work. SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996) ("full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8-hour workday"). A finding that Plaintiff was actually limited to sedentary work would a direct a finding of disability as of her 50th birthday of October 24, 2014. Under the "Grids," an individual between the ages 50 to 55 ("closely approaching advanced age") of Plaintiff's background limited to exertionally sedentary, unskilled work directs a disability finding. 20 C.F.R. part 404, subpart P, App. 2, Rule 201.14.

The ALJ's finding that Plaintiff was limited to walking and standing two hours each in an eight-hour workday, at best, reflects the ability to perform less than a full range of light work. SSR 83-12 (*Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work*) pertains to instances where "the exertional level falls between two rules which direct opposite conclusions, *i.e.*, 'Not disabled' at the higher

-18-

exertional level and 'Disabled' at the lower exertional level." 1983 WL 31253, at *2 (January 1, 1983). First, where the "exertional capacity that is only slightly reduced in terms of the regulatory criteria could indicate a sufficient remaining occupational base to satisfy the minimal requirements," a finding of "Not disabled" is warranted. *Id.* Second, "if the exertional capacity is significantly reduced in terms of the regulatory definition, it could indicate little more than the occupational base for the lower rule and could justify a finding of 'Disabled.'" *Id.* Third, "[i]n situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere 'in the middle' in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability." *Id.* at *3. In the third instance, the assistance of a VE "is advisable." Assuming that this case involves the third instance, the VE's testimony that a substantial number of light jobs existed despite the limitations on walking and standing constitutes substantial evidence in support of the finding that Plaintiff could perform light work (Tr. 76).

On the other hand, Plaintiff's inability to perform the most critical requirements for light work (walking and standing for around six hours a day) also suggests a *significant* reduction in the ability to perform light work as stated in the second instance. SSR 83-12, at *2. In this case, the light, unskilled occupational base is further eroded by the imposition of a sit/stand option allowing standing of no more than 45 minutes at a time or walking for 20 (Tr. 16). "Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will." SSR 83-12 at *4 ("most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task"). Where a sit/stand option is imposed, a vocational expert "should be consulted to clarify the implications for the occupational base." *Id.* As noted

above, the VE found that the sit/stand option, coupled with the reduced walking and standing requirements, nonetheless allowed for a limited range of light work.

However, the hypothetical modifiers, and by extension the ultimate RFC, strongly point to a limitation to sedentary work.  The RFC allows for walking for up to two hours a day but no more than 20 minutes at a time (Tr. 16).  While walking for no longer than 20 minutes at a time appears to address the allegations of lower extremity limitations, Plaintiff would nonetheless be required to walk for an average of 15 minutes each hour to total two hours of walking in an eight-hour workday.  To the extent it could be argued that the job findings merely *allow* for walking "up to" two hours (and could conceivably require significantly less), the requirement for "up to" two hours walking further supports the finding that the RFC is *de facto* sedentary.  *See Wilkerson v. Commissioner of Social Security*, 278 F.Supp.3d 956, 959 (E.D.Mich., 2017)("four hours of standing and/or walking erodes the occupational base for light work so significantly that a sedentary rule should be used as a framework for the disability determination").  Further, it is unclear how Plaintiff could perform the job of cashier or bench assembler (of electrical accessories) while walking an average of 15 minutes an hour.

### B. Dr. Jennings' Treating Opinion

Plaintiff also argues that ALJ failed to provide "good reasons" for according "little weight" to Dr. Jennings' treating opinion and instead, according more weight to one-time or non-examining sources.  *Plaintiff's Brief* at 19-23.  He notes that while the Appeals Council remanded the case for rehearing for further discussion of Dr. Buchman's 2012, non-examining opinion, the ALJ did not provide an explanation for declining to adopt Dr. Buchman's finding that Plaintiff was limited to lifting only 15 pounds.  *Id.* at 22-23 (*citing* Tr. 205).

-20-

For the period under consideration, the failure to articulate "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 376 (6th Cir. 2013); *Wilson v. Commissioner of Social Security* 378 F.3d at 544–546 (6th Cir. 2004); § 404.1527(c)(2)); SSR 96–2p, 1996 WL 374188, \*5 (1996)).[3] "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.' " *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' " *Gayheart*, at 376  (*citing* SSR 96–2p, at \*5).

The ALJ cited Dr. Jennings' findings at length, first citing her September, 2011 records showing a restricted range of cervical spine motion but full strength of the upper extremities (Tr. 17).  He noted that Dr. Jennings referred Plaintiff for a surgical consultation after she failed to respond to conservative treatment (Tr. 18).  He noted that two months after treatment, Dr. Jennings' records showed right hand numbness, cervical spasms, a reduced range of motion, and continued pain (Tr. 18).  He cited Dr. Jennings' finding of cervical post-

---

[3]

The administration rescinded SSR 96-2p on March 27, 2017. See Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 FR 15263-01 (Mar. 27, 2017). Under the new rules, ALJs will weigh both treating and non-treating medical evaluations based on how well they are supported by the remainder of the record. 20 C.F.R. §§ 404.1520b; 416.920c. The "new rules, however, apply only to claims filed on or after March 27, 2017." *Hancock v. Commissioner of Social Security*, 2017 WL 2838237, at \*8 (W.D. Mich. July 3, 2017)(*citing Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01 (Jan 18, 2017) ). Because current Plaintiff filed his claim well before March 27, 2017, SSR 96-2p applies.

laminectomy syndrome and adhesive capsulitis of both shoulders (Tr. 18). He cited September, 2012 and March, 2013 records showing good results from nerve blocks but "increased burning and tingling" of the right shoulder and arm; a limited range of neck motion; and diagnoses of cervical radiculopathy and post-laminectomy syndrome (Tr. 18). He recounted Dr. Jennings' finding that Plaintiff was unable to perform the exertional requirements of even sedentary work, experienced problems in focus due to pain, and was unable to perform more than occasional bilateral fingering (Tr. 23). However, in the next paragraph, the ALJ stated that he accorded "little weight" to Dr. Jennings' opinion, stating only that her opinion "regarding [Plaintiff's] physical ability to perform basic work activities" was "inconsistent with the treatment notes" (Tr. 23). He noted only that Dr. Jennings "identified significant limitations that are not supported by the clinical findings of record" (Tr. 23).

As an initial matter, Defendant is correct that ALJ Fallis provided an exhaustive discussion of the treating, consultative, and non-examining sources. *Defendant's Brief,* 12, *Docket #21,* Pg ID 1895. The ALJ acknowledged Dr. Buchman's finding that Plaintiff was limited to 15 pounds lifting as required by the Appeals Council remand order (Tr. 19, 205, 626), but accorded the finding only partial weight in favor of Dr. Digby's non-examining findings that Plaintiff was capable of lifting up to 20 pounds (Tr. 24-25, 147) .

While substantial evidence in the form of consultative and non-examining findings might arguably support the ALJ's finding that Plaintiff could lift up to 20 pounds, the ALJ's one-sentence explanation for rejecting the findings of the long-term treating source is less than satisfactory. The bulk of Dr. Jennings' treating records cited by the ALJ (showing a limited range of motion, spasms, and continued pain) appear to support her opinion that Plaintiff was unable to perform even sedentary work. The ALJ's failure to provide more than

-22-

a conclusory rationale for rejecting Dr. Jennings' findings is of further concern given his almost exclusive reliance on the one-time consultative and non-examining sources to support the non-disability findings. *See* II.D., *above.* "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend v. Commissioner of Social Sec.,* 375 Fed.Appx. 543, 552, 2010 WL 1725066, at *8 (6th Cir. April 28, 2010)(ALJ's finding of "no basis" for treating opinion of limitation, without more, not "sufficiently specific" grounds for rejecting treating source opinion).

Given that Dr. Jennings' treating records as a whole support a disability finding, the failure to satisfy the articulation requirements of the treating physician analysis is of particular concern.   Further, the fact that some Dr. Jennings' findings (limitation to occasional fingering and less than 10 pounds lifting) seem to be contradicted by the normal EMGs of the upper  extremities and consultative findings of full muscle strength, does not excuse the ALJ's failure to provide more than a cursory rejection of the treating opinion. *See Dalton v. Berryhill,* 2017 WL 766908, at *2 (S.D.Ohio February 27, 2017)(*citing Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009)(finding that treating opinion of exertional limitation "inconsistent with other medical evidence or record" not adequate basis to discount treating opinion. "'ALJ []not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion.'").

"We do not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Hensley v. Astrue,* 573 F.3d 263, 267 (6th

Cir. 2009)(internal citations omitted). Given that the cursory treating physician analysis is coupled with an RFC reflecting sedentary rather than light work, an adequate analysis of Dr. Jennings' findings is particularly important. As such, the ALJ's failure to provide satisfactory reasons for discounting Dr. Jennings' treating opinion requires a remand for further fact-finding.

Notwithstanding the length of time between Plaintiff's application and the present, an award of benefits is premature. A remand for an award of benefits is appropriate "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Hum. Servs.,* 17 F.3d 171, 176 (6th Cir.1994). Accordingly, I recommend a remand for further administrative proceedings consistent with this Report.

## <u>CONCLUSION</u>

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment [Docket #14] be GRANTED to the extent that the case is remanded to the administrative level for further proceedings, and that Defendant's Motion for Summary Judgment [Docket #21] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v.*

-24-

*Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6ᵗʰ Cir.  1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 28, 2019


---

## CERTIFICATE OF SERVICE

I hereby certify on February 28, 2019 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to non-registered ECF participants on February 28, 2019.

s/Carolyn M. Ciesla
Case Manager for the
Honorable R. Steven Whalen